3220336, the people of the state of Illinois, Applee v. William McGuire, Appellant. Mr. Ivick, is that correct? Yes, it is. Good morning, Your Honors. You may proceed. Thank you. My name is John Paul Ivick. It is my honor to be standing before you today representing the appellant, Mr. William McGuire. The defendant presents two issues on appeal. First, that the defendant was not proven guilty beyond a reasonable doubt of count one, home invasion with the bludgeon, which requires proof of a dangerous weapon other than a firearm. The second issue is that the defendant was not proven guilty beyond a reasonable doubt of being the person who attacked Mrs. Davis. In the simplest terms, a conviction must be based upon the record and all reasonable inferences drawn there from. We are strictly limited to the testimony of the witnesses and the exhibits which the trial court has received. We submit that there is no evidence of the bludgeon, no exhibits admitted, no photos or video of the object admitted. The only evidence was the testimony of a sole eyewitness, Mrs. Davis, who only identifies the object as a black semi-automatic handgun. The trial court had the ability to listen to Mrs. Davis, to judge her demeanor, her credibility and her reliability as a witness. The court rejected her assertion that there was a firearm and acquitted Mr. McGuire of all firearm charges. The court entered convictions of home invasion, bludgeon and trespass to this court. What evidence was presented at trial from which the trial court could infer that the object identified as a gun was a dangerous weapon, bludgeon? I will first provide a brief summary of the relevant case law and the standard of review that they used and then recite the relevant facts and evidence from our case. As announced in Ross, I'm sorry, an actual gun is not necessarily a dangerous weapon. Our Supreme Court in People v. Ross held that Illinois cases do not create a mandatory presumption that any gun is a dangerous weapon. Instead, our cases conclude that the trier of fact may make an inference of dangerousness based upon the evidence. The state may prove that a gun is a dangerous weapon by presenting evidence that the gun was loaded and operable or presenting evidence that it was used or capable of being used as a bludgeon. As announced in Ross and also applied in People v. Thorne, People v. Harris and People v. Dixon, there are three ways for a state to prove a gun constituted a dangerous weapon. By presenting evidence, one, that the gun was operable and loaded, by presenting evidence that the gun was actually used during the offense as a club or bludgeon, or by presenting evidence that the gun's size and weight, it was capable of being used as a bludgeon. We presented six cases. Six of them took a de novo approach. People v. Davis, the Supreme Court applied a de novo review in reversing the trial court's finding that an appellate gun was a dangerous weapon. In People v. View, the appellate court used a de novo review to determine metal flashlight was not a bludgeon. In People v. Cole, the appellate court used a de novo review to determine if an object used met the definition of metal knuckles. In People v. Westmoreland, the appellate court applied a de novo review to determine that a belt which led to an emergency room treatment for a child was not a dangerous weapon. In People v. Harris and People v. Dixon, the court also applied a de novo review where the trial court's findings were not based upon witness testimony by reviewing a video where the trial court did not occupy a position superior to the appellate court in evaluating the evidence offered by the state. The appellate court in reversing the trial court's finding that the gun was a dangerous weapon bludgeon found that the state did not present any evidence of the three ways a gun can be dangerous. First, there was no evidence that the gun was loaded. Second, there was no evidence the gun was used or brandished as a bludgeon. And third, there was no testimony regarding its weight or composition that after examining the surveillance video, the court was unable to determine the gun's physical characteristics. Two cases apply a deferential standard. People v. Ross, our Supreme Court, applied the deferential standard as it upheld the appellate court's reversal of the trial court's finding that appellate court was a bludgeon. The court found that the state did not present any evidence of the three ways that a gun could be dangerous, that the gun was small, portable, concealable with a three-inch barrel, that there was no evidence that it was loaded, there was no evidence that it was brandished as a bludgeon, that there is no evidence of its weight or composition, the state never presented the gun or photographs of a gun at trial, that the court improperly focused upon the subjective feelings of the victim rather than the objective nature of the gun. Similarly, in People v. Thorn, the appellate court applied a deferential standard as it overturned the trial court's finding that a black BB gun was a dangerous weapon bludgeon. The victim was robbed by having the gun placed in his back and then pointed at his head. The court took an exhaustive look at the existing case law and concluded that the state did not present any evidence of the three ways a gun can be dangerous. There was no evidence that it was loaded, there was no evidence that it was used as a dangerous manner, and there was no evidence as to the physical characteristics, weight, or metallic nature of the weapon. The state did not introduce the gun or photos into evidence and the officer's description of a marksman black BB gun as a hard object was insufficient circumstantial evidence to support a finding that it could be used as a bludgeon. All of these cases we find that where the state fails to offer sufficient evidence about the use or characteristics of the gun that the trial court is not free to assume facts not into evidence and a conviction cannot stand. As this applies to our case, we have a sole witness who testifies only that it's a black automatic gun. No gun was admitted or a picture of the gun was admitted into evidence, there's no testimony about it being loaded or operable, there's no testimony about the gun being used as a weapon. There was no testimony that the gun was brandished or waved in such a manner that the victim was afraid of being stricken. On the contrary, testimony was only that it was used as a gun. A man entered her house with a gun in his right hand, the victim grabbed his hand, and the struggle ensued. She was pushed on the ground, but the struggle was not to keep from being struck by the gun. She attempted to turn the gun to face his face. She repeatedly said that she grabbed his hand and turned that gun to face to point at him. A bludgeon doesn't care which way it's pointed. There further was no testimony about size, weight, composition. Was this object small and light? Was it heavy or hard? Was it dense? Was it brittle? Was it made out of wood? Was it made out of metal? Was it made out of plastic or foam or paper mache? We don't know because the trial court had no evidence at all from which it can make its conclusion. Again, the trial court is free to reject the witness's testimony, which it did. It did not find that there was a gun, but the court is not free to create or assume facts not in evidence. Since there is absolutely no evidence of three ways that a gun can be dangerous, the trial court's conviction must be overturned. Our second issue is based upon cases of People v. Rodriguez and People v. Hernandez. In summary, where sole eyewitnesses to a crime lack credibility and there's no corroborative evidence linking the defendant to the crime, the defendant cannot be proven beyond reasonable doubt. This is a case of uncertainty of identification. We had an expert, Dr. Strange, who testified about the difference between recognition memory and comparative memory. Recognition memory is super fast, recognizing your spouse or your child, versus comparative memory where you use a strategy to eliminate options. Dr. Strange testified that after eight seconds, accuracy falls off a cliff. The different things that can affect your memory, trauma, stress, presence of a weapon, these affect a person's ability to encode facial features and make identification difficult. That further, there's something called the feedback effect, where a witness would falsely identify bystanders as the perpetrators. The judgment made at the initial judgment is meaningful, not the later identification at trial. That a victim's perception often changes upon arrest and becomes even more certain by the time there's trial. Certain factors, such as showing the victim a photo of the suspect prior to the lineup, has been the subject of study and will change a witness's confidence and change the actual memory of the event. In our case, Mrs. Davis didn't even recall that she was previously shown a photo of Mr. McGuire on the day of the attack. The uncertainty of the identification can clearly be demonstrated in the video of Mrs. Davis being shown the photo array. She was unable and unwilling to positively identify Mr. McGuire. She struggles for approximately 16 minutes of the video and expresses an uncertainty of 25%. She comforts herself with the fact that actual objective evidence was taken, that officers took fingerprints and DNA. The trial court is not in a superior position than this court in weighing her uncertainty. This court can view the video and judge for itself about her inability or refusal to make a positive ID in a 16-minute time period. The trial judge himself expressed uncertainty when he said, this is a close one. The male DNA underneath the fingernails of the victim excludes the defendant and this is not an insignificant fact. In fact, it embeds reasonable doubt deep in the heart of the state's case. Dr. Strang cited an Illinois Supreme Court case of People v. Lorma where DNA evidence exonerated individuals despite eyewitness identifications. At the time, there was a study based upon 40 different individuals exonerated by DNA evidence. Our case, like Lorma, there is DNA to counter an unreliable witness. Unlike Hernandez and Rodriguez, in our case, it's not just an absence of corroboration, but there's physical evidence that exonerates the defendant. Human head hair on the shirt of Ms. Davis that she was wearing did not belong to Ms. Davis or Mr. McGuire. Male DNA under her fingernails, Mr. McGuire was excluded as the source. This is not an insignificant fact. We have uncertain identification, no fingerprint evidence at the scene, no weapons recovered, no GPS confirmation. The hair and DNA excludes the defendant. All lead to the conclusion that a conviction cannot be sustained beyond a reasonable doubt. In conclusion, the defendant is asked in this court to answer two questions. First, what evidence was presented at trial which the court could infer the object identified the gun was a dangerous weapon of bludgeoning. Like Ross, Thorne, Harris, and Dixon, the state failed to present any evidence in the three ways. Second was the reasonable doubt. Where an uncertain identification by a sole witness lacked corroboration and physical evidence exonerated the defendant, we ask you to find the DNA evidence is not insignificant, but embeds reasonable doubt for the heart of this case, and equip my client of all accounts. Thank you. Any questions from the court? Not at this time. No. Okay. No. Thank you, counsel. You'll have time in reply. Thank you. Mr. Genetovic, you may respond. Thank you, your honor. May it please the court. My name is Gary Genetovic, from the State's Attorney's Appellate Prosecutor's Office on behalf of the people. May it please counsel. What I'm going to take and do is I'm going to take and kind of sort of start from subparagraph C of the defendant's reply brief, because I think it kind of together pretty much the state's argument here. And it also deals with the question of standard of review. And defendant's reply brief makes the point that an item is identified as a firearm. That is something that simply identifies the object that you see. But the defendant cites the Ross case. And yeah, the Ross case found that there was insufficient evidence. But the test to be applied here is not the subjective name given to the object. Rather, it is the objective nature of the item itself. That's the reason why a firearm has been determined not to necessarily be per se a dangerous weapon. But basically, you have to take and show that it's loaded and operable. In this case, the gun wasn't fired. The victim was fighting with the individual. So it's obviously a matter of fact that could not be proved, especially since no gun was ever recovered. So to take and say we didn't adduce any gun, we just can't go out to the local gun store, pick up a gun, bring it in and say, hey, this looks similar to that. And therefore, this must have been the type of gun to use. And it's this, that, and the other thing. We didn't have that evidence available. The other way of being able to show that the gun is a dangerous weapon, not necessarily because it can be used as a firearm, but because it can be used as a bludgeon. And what the Supreme Court in Ross stated that it is the character of the gun such that it is conceivable that it can be used as a bludgeon. So what evidence do we have in this case? Well, we have the evidence in this case where the individual barges in, points the gun and uses the gun and gets right in her face and comes right toward her face with the gun, of which she grabs, and of which she's then able to take and grab the hand, obviously the hand with the gun, feel it, turn it. And she then testifies, she's familiar with guns. She grew up with guns. She knows the difference between guns. She specifically identifies this as an automatic firearm that was a real firearm. Yes, indeed, there's no specific testimony that it's metal. Obviously, if it's a real firearm, it's not plastic. It's not paper mache. Okay. We have an idea from the testimony that can be inferred from the testimony exactly what it is that was confronting this victim. And so in this case, because of the nature of the item, and because of the fact that the judge in this case did acquit the defendant of the home invasion based on the fact of the use of the firearm, basically decided that it was more in line with the bludgeon. And there's another aspect of this that I'll get to in a little bit as to why I think the trial judge may have held what he did. But the thing about it is the fact that this is the reason why in this case, we have a factual issue presented. Was this gun a dangerous weapon as defined in Ross as such a character that it could have been used as a bludgeon to satisfy count one for which the trial judge did find the defendant guilty. The reasonable doubt standard. So you're talking about section 9.6 home invasion, right? Yeah. Yes. And what based as far back as columns, as far back as 1985, when all this was reasonable doubt standard was established. The reasonable doubt standard basically is to determine the factual issues. Courts are not in when a reasonable doubt argument is made. Courts are not there to retry the defendant and they're not there to reweigh the evidence or to assess weight of the evidence. It's there to determine whether or not a rational trier of facts could have found all of the elements beyond a reasonable doubt. In other words, is there evidence, not the weight of the evidence, not facts determinations, not credibility determinations, but whether there is evidence there that in light most favorable to the state. Establishes improves the elements of the crime beyond a reasonable doubt. In this case, the trial judge determined that based on the evidence that he had and all the inferences that he had, he determined that basically this gun, if it was used, was used more as a bludgeon than actual as a firearm. And what was the evidence, Mr. Genetovic, if you could present it? The evidence, I think, as I explained, the evidence is the fact that how the gun was used. The gun was never fired. Okay. The gun was pointed. Yes. The victim grabbed the gun. The perpetrator came at the individual with the gun, stuck it in her face. Okay. Ross basically also says the gun does not have to be used as a bludgeon. In other words, you don't have to necessarily have, as was pointed out here, a swinging or an attempt to take and strike the individual or an actual striking. It's basically how it is used. How is it even capable? Is it conceivable? In this case, it is very conceivable. The only thing that stopped everything was the victim in this case, grabbed the hand, grabbed the gun and twisted and turned it. Yes, she did testify. She did it to get the burrow away from her face, which I think is a human reaction, but it also prevented him from basically now striking her with the gun as well. So I think what we have is I think we have sufficient evidence here that the trial judge could make that inference and could actually find guilt on count one. So to summarize it more just simply, is that you're arguing is that it's conceivable that this firearm could have been used to strike the victim? Is that correct? That would be correct, Your Honor. Yeah, a lot simpler, right? It's conceivable. Yes, it is. By the placement of the gun so close to the face? Yes. All right. I just and that's the reason why in this case there isn't any de novo review of anything. These are fact questions. And as there are fact questions, the common standard of review is what needs to really be used to assess the sufficiency of the evidence to prove this defendant guilty beyond a reasonable doubt. And the cases that have been cited, a lot of the cases that were they rejected whatever was presented. For example, in Thorne, it was a black BB gun. It was just a hard object, but there was nothing else about that particular aspect. In that particular case being a black BB gun, a BB gun can be metal, BB gun can be otherwise. In the Dixon Thorne, the problem there was the trial judge basically assessed the item that was used, the metallic item that was the victim. And that violates Ross because you don't use the subjective belief of the victim, you use the objective nature of the object. And because in this case we have the testimony from the victim that we do, we do have an objective basis from which to draw upon to take and say that this was a firearm that could actually be used as the bludgeon. We do have, we don't have identified it as such, I think is sufficient to take and establish the evidence that we need for the objective basis of the character of the weapon in this case, as opposed to those cases cited by the defendant. But identifying it as a firearm per se takes it out of the statute, doesn't it? So what's this objective basis? The objective basis is the fact that what you have to do is based on her feeling of everything, based upon her action and her ability to take and say that it was a real gun, okay? And a real gun is metal, a real gun is heavy, a real gun has all of the characteristics that are associated with that can be used as a bludgeon that could hurt. That is what we have in this case. And that I think is sufficient to establish count one beyond a gun. If there are any questions on that, okay, with respect to the identification, succinctly, I think that basically if you take a look, just have to look at the Neil factors, Neil versus bigger factors, opportunity, degree of attention, accuracy, level of certainty, length of time between the crime and identification. In this case, to take the opportunity to view at the time of the crime, the witness's degree of attention, based on her very explicit testimony, detailed testimony, and the accuracy of her prior description, all those first three factors all favor the adequacy and the sufficiency of the identification. The level of certainty. Defendant makes a lot to do about the fact of when she went to the police station to make this identification, 16 minutes she expressed uncertainty, let's say. But the uncertainty was not because of the fact that she didn't know or she was really truly uncertain about who it was. The fact of the matter is, as she testified, if I could have seen the entire structure of the individual, because her identification wasn't just based on the face, okay? That is included as part of her description, but her identification was based on the entire structure of the individual, the intruder, that she adequately described at the event, shortly after the event occurred, right? And so shortly after the event occurred, what did she do? She identified or she recognized the intruder. And so under the circumstances, I think that this level of certainty, this abundance of cautiousness, as she testified to, she was very cautious because she didn't want to identify the wrong person, you know? And then I think there's something that obviously we see a lot with identifications and DNA and all of this. So she wanted to be certain. And because she couldn't see the whole picture, the whole man, she couldn't tell how tall he was. She couldn't tell if he was, you know, 200 and some pounds. She couldn't tell anything other than the face. But she was 75% sure, based on the face alone, that that was the man. When she was able to take and see the whole picture, she had absolutely no question that that was the individual who attacked her. And there is, okay, yes, there is no DNA evidence. And the DNA evidence under the fingernails, I think is a little bit overplayed. There's nothing here in any of the evidence that she scratched the victim, that she somehow would have had under her fingernails, this defendant's DNA. The fact that a different hair was found on her sweater, again, that's not really something that's significant. It's not significant. Yeah, it's not the defendant's. But the thing is, she's worn the sweater before, she's come in contact with other people, that hair could have gotten there from anybody, not necessarily the intruder. What we have in collaboration is we've got the defendant driving by Bob's furniture discount one minute before the victim enters that store. We got the defendant in four different aisles, following her at Jewel. We got the defendant, at least from with the clips that we have, never purchasing a thing. We got the defendant coming back in the store, just checking out the checkout aisle, okay, and then leaving. We also have the fiber that was found in the victim's house around her that basically matched the sweater that was found, the blue color sweater that was found and seized from the defendant's house. We have the large flame glasses. We have the contents of the search that was done on his computer, okay, and we have defendant's volunteered statement when the police showed up. Oh, this is about the attacking of a woman. How would the defendant know why the police were there, attacking of a woman? How would he know? So we do have sufficient corroborating evidence along with the victim's positive identification shortly after the event and then as well as the two positive identifications, the photo array. I think that we have more than sufficient evidence to establish the identity of the defendant as the perpetrator in this case. Therefore, based upon all of this, the people would ask this court to affirm defendant's conviction and sentences as they have been imposed. If there are any other questions, I will be happy to take and respond. Any questions from the bench? No, sir. None from me either. If I can explain though, I lost connection and I'm going to have to listen to the argument in its entirety, but I wanted to join back in at this point in time. And to further explain, I am in the hospital parking lot right now. My mother's going through procedure and that's why I'm not, I don't have the same background as the others, but I have all of my papers with me. Please continue. I don't have any questions. Okay. Mr. Ivick, you may reply. Thank you. In response to counsel's argument about what standard to use, I think the issue is whether or not this is definitional or uncontested facts, whether this court is in a better position than the trial court. Again, different courts have applied different standards. It doesn't matter whether it's de novo or deferential because in both cases, the courts find that it's not permissible for a trial court to assume facts not into evidence. And that's what counsel's asking this court to do. There are only three ways to prove that the gun constituted a dangerous weapon, a bludgeon. That it was operable and loaded. We don't have that here. That it was actually used during the offense as a club or bludgeon. And counsel kind of tried to say that, but then backed off and said it was the characteristics. But let's look at that. Again, there was no testimony that it was used to strike or threaten that it was grabbed by the barrel. The whole testimony was it was a gun. It was pointed at her. She was trying to turn, she fought to turn it back away. And again, a bludgeon doesn't care. I think it's illustrative if we look at people versus Thorne. A gun was placed into the back of the robbery victim and then pointed at his head. And the court found that that wasn't evidence of it was used as a dangerous manner. If we take counsel's argument that just having a proximity to the head when it's pointed at it is enough to be a bludgeon, then you would have to ignore Thorne. And people versus Ross, Supreme Court gave an illustration of when a gun is actually used as a bludgeon. When it's grabbed by the barrel, the Supreme Court stated. We don't have that here. The gun was not used. There is no evidence. Only the testimony of Ms. Davis, who always said it was a gun and always tried to point it away from her. There was no evidence that was used as a bludgeon. Let's go to that Supreme Court case. The attributes of the firearm were, well, when you said the gun is grabbed by the barrel, that defined it into a bludgeon? And people versus Ross, it's on page 878 of the Northeast Second, they gave an illustration that a handgun when gripped by the barrel can be used as a bludgeon. And that was an example. It wasn't the actual facts of the case. Let's take that apart a minute. Could you repeat that again for me? That a handgun, when gripped by the barrel, can be used as a bludgeon. Well, gripped by whom? Court doesn't state. Well, do you think that makes a difference? I don't think it makes a difference. It makes a difference if you're saying that the attacker is using it as a bludgeon. If he isn't using it as a bludgeon, if he's pointing it, that doesn't make it a bludgeon. Otherwise, Thorne would say it was sufficient. In Thorne, it was pointed close to the victim's head. It was identified as a gun, and it was pointed at the head. I think when there's no evidence of its use, then we go to the characteristics. And that's the part that you can't assume facts and evidence. We have here black handgun. We don't know what that means to this victim. We don't know if all her handguns in her mind have to be metal. We don't know if they're heavy. We don't know how big this is. Is this a small Dillinger? Is this something that's larger? Again, it's facts, not an evidence. And that's why you can't just do this. I'm finally going to the... Mr. Ivek, excuse me. In the time that you have remaining, can you address the September 28, 2016 interview in which the defendant made the response when the investigation, he volunteers, it's about attacking a woman? Can you talk about that, please? Sure. I'm happy to. In that, they were interviewing him at his house with a search warrant. And they asked him about that he was coming from, what he was doing. He said he had a condo that he was trying to sell, that he may have stopped at the Jewel. That comment about attacking a woman is no more evident of that he knew what happened than in Rodriguez. There was a similar gotcha question where it was a toy gun, a fake gun that they were talking about. And he says, oh, we bought the fake gun. And that wasn't sufficient. The gotcha question has other explanations. It's not beyond the pale to think that if officers are right in your house that there's a reason for it. And I think, again, unlike Rodriguez and Hernandez, we have DNA. Counsel said that there's no DNA. Well, there was DNA. There was male DNA. Male DNA under her fingernails. There was a life and death struggle. She grabbed his hand. She dragged him across the the gun pointed at him. They took her fingernails hoping to find DNA, and they found DNA. It wasn't my client. And that same uncertainty, she was comforted by the fact that DNA was recovered. And the DNA excludes my client. Your time is up in reply, Mr. Ivic. Are there any further questions from the bench? None. None for me. Okay. Thank you. Counsel Bowles, thank you for your arguments in this matter. This afternoon, it will be taken under advisement and a written disposition shall issue.